**In re Robert W. GYURCI, a/k/a Bob W. Gyurci, Debtor.**

**Bankruptcy No. 4–88–2411.**

United States Bankruptcy Court, D. Minnesota.

Jan. 20, 1989.

Richard Pearson, New Brighton, Minn., for debtor.

Michael Fadlovich, for U.S. trustee.

## MEMORANDUM OPINION

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled case came on for hearing before the undersigned on a motion by the United States Trustee to dismiss this case under 11 U.S.C. section 707(b). Michael Fadlovich appeared for the United States Trustee; Richard Pearson appeared for debtor. The court has jurisdiction to hear and determine the issues pursuant to 28 U.S.C. sections 157 and 1334 and Local Rule 103(b). This is a core proceeding under 28 U.S.C. section 157(b)(2)(O).

Based on the papers submitted, the evidence taken and the files, records and proceedings herein, I determine the following:

## FACTS

Debtor is an attorney licensed to practice in this state. Since 1974 he has been an Assistant Hennepin County Attorney spe-

cializing in welfare fraud and drug forfeitures. His job is secure. He grosses $67,200.00 per year. There is evidence that he has reached his maximum level of advancement with his current employer and that he knew this several years ago. He has high blood pressure and secondary diabetes, but there is no evidence that either of these two ailments has substantially impaired his earning capacity.

Debtor's wife, who has chosen not to file bankruptcy because she views debtor's problems to be of his own making, has been steadily employed during all relevant periods of time. In her current position she grosses $16,588.00 per year. She has chronic back problems which have, in the past, caused her to miss substantial periods of time from work. She was hospitalized for over three months in 1985. The record is devoid of evidence, however, that her back problems have ever affected her ability to earn or otherwise substantially impaired her income.

Debtor and his wife have three children, two of whom are well beyond the age of emancipation, being 23 and 25. Both of them have finished college, as debtor candidly admitted, using funds derived from credit cards. Neither of them is currently receiving support from their parents. Their third child is 18 and a senior in high school. By choice, debtor and his wife have placed that child in an exclusive private high school. Neither the parents nor their son has funds saved to send the boy to college. His father states that he expects to fund the son's college education upon graduation from high school this coming spring, just as the mother has worked to fund the boy's high school private education.

This family of three, soon to be two, thus has a combined gross income of $83,788.00. They own a home valued at $115,000.00, in which they have $57,500.00 in equity, and on which there is a first and second mortgage totalling $57,500.00. The family owns and maintains five vehicles: a 1987 Toyota, a 1983 Toyota Tercel, a 1982 Chevrolet Chevette, a 1981 Volkswagen, and a 1968 Mercury Station Wagon.[1] The two older children were college educated on their father's borrowed money. Their third child is, as indicated, in private school and expects parents' aid to fund his upcoming college education.

At inception of this case debtor held 17 credit cards that had been issued to him. His wife holds at least five more, apparently in her own name. Debtor began acquiring his credit cards in 1981. Credit card debt over the years between 1981 and 1987 was as follows:

| Year | Average Balances | Interest Paid |
|------|------------------|---------------|
| 1981 | $     833.00 | $     150.00 |
| 1982 | $11,150.00 | $  2,000.00 |
| 1983 | $17,916.00 | $  3,225.00 |
| 1984 | $22,277.00 | $  4,010.00 |
| 1985 | $30,033.00 | $  5,406.00 |
| 1986 | $41,727.00 | $  7,511.00 |
| 1987 | $70,416.00 | $12,675.00 |

Debtor used his credit cards in large part as a bank for obtaining cash advances. He began with a few and accumulated more and more over the years. Almost all cards came unsolicited in the mail. He regularly paid the minimum balances. The funds were used for living expenses, including the payment of college costs for the children, plus paying off the minimum balances.

The average interest rates on the cards was 18–21%. Debtor's credit card indebtedness, however, increased at a rate greater than that, indicating that some significant portion of the funds borrowed were used for family expenses.

Debtor and his wife's combined net incomes, after withholding, total $4,233.00 per month. Against this, the family claims the following monthly expenses:

1. 1st & 2nd Mortgage      $ 810.36
     Payments
2. Utilities & Insurance
     and Costs on the
     home as follows:
     a. Insurance      $25.13

---

1. There was some evidence that one of the sons actually paid for and pays the maintenance on the 1982 Chevette. It is unclear from the evidence presented whether this is the son who left home or the younger son who still lives with his parents. Debtor does hold title to the vehicle and claimed it as exempt on his schedules.

|       |                              |           |           |
|-------|------------------------------|-----------|-----------|
| b.    | Sewer & Water                | $20.00    |           |
| c.    | Garbage                      | $12.00    |           |
| d.    | Home Mainte-nance            | $65.00    |           |
| e.    | Electricity                  | $61.00    |           |
| f.    | Phone                        | $41.00    |           |
| g.    | Cable TV                     | $25.00    |           |
| h.    | Gas                          | $71.00    |           |
|       |                              |           | $ 320.13  |

3. Automobile Expenses

|                                                     |           |           |
|-----------------------------------------------------|-----------|-----------|
| Gas                                                 | $100.00   |           |
| Maintenance                                         | $ 50.00   |           |
| Parking (presumably in downtown Minneapolis)        | $ 75.00   |           |
| Licenses                                            | $ 25.00   |           |
| Insurance                                           | $228.00   |           |
| Car Payment for debtor (presumably on the Toyota Camry) | $327.37 |       |
| Wife's car                                          | $165.25   |           |
|                                                     |           | $ 970.62  |

|    |                                            |           |           |
|----|--------------------------------------------|-----------|-----------|
| 4. | Food and supplies                          |           | $ 350.00  |
| 5. | Clothing                                   |           | $ 145.00  |
| 6. | Uninsured dental and optometrist costs     |           | $  85.00  |
| 7. | Insurance                                  |           |           |

|                          |           |           |
|--------------------------|-----------|-----------|
| Life—debtor              | $259.00[2]|           |
| Medical—debtor           | $ 20.00   |           |
| Wife's medical & life    | $ 21.00   |           |
|                          |           | $ 300.00  |

|    |                                            |           |
|----|--------------------------------------------|-----------|
| 8. | Son's Private School Tuition & School Expenses |  $ 395.00 |
| 9. | Wife's separate indebtednesses             |           |

|              |           |           |
|--------------|-----------|-----------|
| Loan         | $125.00   |           |
| 5 credit cards | $211.00 |           |
|              |           | $ 336.00  |

10. Miscellaneous

|                              |           |           |
|------------------------------|-----------|-----------|
| CLE and attorney's license   | $ 25.00   |           |
| Debtor's work expenses       | $ 60.00   |           |
| Church                       | $100.00   |           |
| Postage                      | $  6.00   |           |
| Newspaper                    | $ 15.00   |           |
| Music lessons                | $ 18.00   |           |
| Cleaning service             | $ 50.00   |           |
|                              |           | $ 274.00  |

| TOTAL | $3,986.11 |
|-------|-----------|

---

**2.** This amount is not excessive. Debtor's diabetes and blood pressure reflect the significant

Thus, according to debtor, at most there is $246.89 in disposable income each month with which to pay creditors.

Debtor lists in his Schedule B–2, personal property as follows: household goods, supplies and furnishings—$1,250.00; wearing apparel and personal possessions—$1,250.00; four of the five motor vehicles referred to above, plus a 1984 Honda motor scooter—$13,900.00; tangible personal property—$275.00; life insurance surrender value—$4,087.00; deferred compensation and PERA funds in an unknown amount. Virtually all of the foregoing were claimed as exempt.

In the bankruptcy schedules debtor further lists secured debt of $65,588.00 which is attributable to the mortgages on his home, debt on his 1987 Toyota Camry, and a modest secured debt to bankruptcy counsel. Unsecured debts amount to $75,-563.00. Virtually all of this debt is owed to credit card companies or consumer credit establishments such as Daytons, Target and Gabberts. There is also a debt for a student loan in the insignificant sum of $221.00.

### DISCUSSION

This motion by the United States Trustee for dismissal for substantial abuse is based on 11 U.S.C. section 707(b), which provides as follows:

> After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by any individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting ·of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

*Id.* This section of the Code was part of the so-called consumer credit amendments added to the Bankruptcy Code by the Bank-

premium.

ruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 355 (the 1984 Act). It has been widely interpreted since its enactment.

The debtor clearly seeks to discharge debts which are primarily consumer debts as that term is used in section 707(b). Section 101(7) of the Bankruptcy Code defines consumer debt as "debt incurred by an individual principally for a personal family or household purpose". 11 U.S.C. section 101(7). *See also In re Kelly,* 841 F.2d 908, 912 (9th Cir.1988) (consumer debt may be secured by real property). All of the secured and virtually all of the unsecured debts of this debtor relate to indebtedness incurred in maintaining that home and other personal and family expenses attendant with the lifestyle to which he and his family have become accustomed. The next issue, then, is whether the filing of the petition constitutes "substantial abuse". In this case, I conclude that it does.

As previously noted, section 707(b) has received wide interpretation since its insertion into the Bankruptcy Code in 1984. The courts have differed with respect to its interpretation. One line of cases, typified by the Ninth Circuit's recent decision in *In re Kelly,* 841 F.2d 908 (9th Cir.1988), takes an expansive view of substantial abuse. These courts find substantial abuse in any case where it is established that the debtor has the ability to pay a significant portion of his debts without undue hardship. *See id.* at 914–15; *In re Walton,* 69 B.R. 150, 154 (E.D.Mo.1986); *In re Hudson,* 56 B.R. 415, 419 (Bktcy.N.D.Ohio 1985) (ability to pay is all that need be shown); *In re Edwards,* 50 B.R. 933, 936–37 (Bktcy.S.D.N.Y. 1985) (evidence of ability to pay is *per se* proof of substantial abuse).

A second line of cases is typified by Chief Judge Kressel's recent opinion in *In re Wegner,* 91 B.R. 854 (Bktcy.D.Minn. 1988). In *Wegner,* Judge Kressel took a more narrow and restrictive view of the boundaries of section 707(b), parting company with *Kelly* and others above mentioned. Judge Kressel held that ability to pay creditors was not in and of itself sufficient to establish substantial abuse. Rath-

er, he viewed the totality of circumstances and concluded that substantial abuse requires proof of something more, including "misconduct, impropriety, or lack of good faith." *Wegner,* 91 B.R. at 858. *Wegner* was a particularly compelling case for denying the motion to dismiss because debtors had incurred such heavy credit card debt that they were ineligible for relief under chapter 13, and by reason of the Eighth Circuit's decision in *Wamsganz v. Boatmen's Bank of DeSoto,* 804 F.2d 503 (8th Cir.1986), ineligible for relief under chapter 11. *Id.* at 505. Had the situation been otherwise, Judge Kressel opined that he would have found substantial abuse based on the debtors' substantial credit card debt and the manner in which it was incurred, coupled with the ability to pay a significant portion of their debt to their creditors. *Wegner,* 91 B.R. at 859, n. 12.

*Wegner* thus takes the view that one must look to the totality of circumstances, rather than to a single indicia of ability to pay. Under the totality of circumstances test, a number of courts have held that the following factors should be reviewed in determining whether there is substantial abuse:

1. Whether the debtors have a likelihood of sufficient future income to fund a chapter 13 plan which would pay a substantial portion of unsecured claims.
2. Whether the debtor's petition was filed as a consequence of illness, disability, unemployment or some other calamity.
3. Whether the schedules suggest the debtors incurred cash advancements and consumer purchases in excess of their ability to repay them.
4. Whether the debtor's proposed family budget is excessive or extravagant, and
5. Whether the debtor's Statement of Income and Expenses is representative of their true financial condition.

*E.g., In re Grant,* 51 B.R. 385, 392 (Bktcy. N.D.Ohio 1985); *In re Bryant,* 47 B.R. 21, 24 (Bktcy.W.D.N.C.1984).

In this case, dismissal is appropriate because debtor meets both the more restric-

tive test espoused in *Wegner* and similar and the much more expansive reading set forth in *Kelly* and its line of cases.

*First,* debtor has the ability to pay a significant portion of his outstanding debt. If debtor's income and expenses are realistically aligned and his belt and that of his family tightened a bit, and if debtor has the fervent desire to repay his creditors, as he testified at this hearing, there is little doubt that he could repay his creditors a significant portion of the outstanding unsecured debt without hardship. By debtor's own calculations, he has approximately $250.00 in monthly disposable income. Developing additional disposable income would not take much effort, although it would, perhaps, require a slightly adjusted lifestyle. Perhaps debtor's son's schooling, his orthodontist, the church, and the parking ramps in Minneapolis would suffer. Perhaps the housekeeper could be dispensed with or his child could give up the scooter. Maybe debtor and his family would conclude that the cable TV is a luxury, or they could stand with fewer or less comfortable vehicles. Perhaps the son, like other children of parents of modest or even not so modest means, could find some way to fund a college education other than at the expense of his father's creditors. As a Judge, with my own very personal views of how and where money is wasted in family economics, I will not tell debtor where to cut. I do find and conclude, however, that with even a modest amount of rethinking lifestyle and expenses, debtor and his family could reduce the claimed expenses by at least $500.00 and perhaps $800.00 per month.[3] If that were done, as I believe it could reasonably be without hardship, debtor would be able to pay his creditors between 40 to 50% of outstanding debt over a three year period in chapter 13; under a five year plan, they could, of course, do more.[4]

*Second,* there has been abuse in the obtaining, retention and use of the multiplicity of credit cards obtained by this debtor. I believe these cards were consciously used over a period of more than five years for at least one principal purpose; to put debtor's children through college. Loans for that purpose at interest rates much lower than 21% were surely available. Those loans, however, except in unusual and extraordinary circumstances, would likely not have been dischargeable. 11 U.S.C. section 523(a)(8). Furthermore, the credit card limits were run up in support of a lifestyle which many would find extravagant, based on the income levels being generated, at a time when debtor's salary level had topped off, suggesting that they were not incurred with an expectation that they could be paid. Moreover, debtor's wife still maintains several credit cards and has not filed bank-

**3.** Deciding whether private schools or five cars or downtown parking or cable TV are reasonable necessities or luxuries necessarily involves judging lifestyles.

> An inquiry into debtor's 'reasonably necessary' expenses is inherent in the examination of debtor's petition for relief. Judgment values of lifestyles have to be made by the court and close questions emerge.

Proia, *The Interpretation and Application of Section 707(b) of the Bankruptcy Code,* 93 Com.L.J. 367, 379 (1988).

In some substantial abuse cases, courts have been called upon to decide whether debtors should stop smoking, eliminate large church contributions, or, in a case quite similar to that at hand, stop sending their children to private schools. *See Sinkow v. Latimer (In re Latimer),* 82 B.R. 354, 363 (Bktcy.E.D.Pa.1988) (although ultimately denying motion to dismiss, court questioned the expense of private schooling); *In re Peluso,* 72 B.R. 732, 734 (Bktcy.N.D.N.Y.1987) (nearly $100 monthly expenditure on cigarettes excessive); *In re Gaukler,* 63 B.R. 224, 225–26 (Bktcy.D.N.D.1986) (court would not inflict its personal views of religious responsibility); *In re Edwards,* 50 B.R. 933, 940 (Bktcy.S.D.N.Y.1985) ($100 monthly religious contribution was a possible luxury). The wisdom of affording such wide latitude to the judiciary in making lifestyle judgments has been questioned. *See* Proia, at 381–82. However, Congress chose not to define substantial abuse but rather to leave it to the development of court-made law.

**4.** The court cannot help but comment that in an even brief tenure on the bench, she has seen numerous instances of young families with few resources and several children, leading a meager lifestyle and struggling to pay creditors in chapter 13. They come to this court, in many instances, intent in their belief that they should and they will do what they can, even if it is on a modest basis, to pay off at least some of their debt. The contrast between these types of cases and the instant case is very dramatic, indeed.

ruptcy. She could easily continue to incur excessive credit card debt for the benefit of the family, later discharging that debt in her own separate bankruptcy. I am not persuaded at all by debtor's argument that he took the cards and used them because they were freely made available to him unsolicited in the mail. It is clear that the rates of indebtedness were ever-increasing, much faster than the interest was accumulating and being paid. There is no evidence of serious catastrophe or family tragedy intruding into the life of this family since 1981, at least insofar as it might have impacted on income. Rather, debtor and his family have lived a good life at the expense of a series of creditors. Under the circumstances, debtor had an option to, as a popular slogan goes, "Just Say No." Not having done so, the least he can do, because he is able, is to use some other if less palatable available route to make peace with his creditors.

In conclusion, the totality of circumstances demonstrates an instance of substantial abuse. Debtor and his wife have substantial income. While not perfectly healthy, they are by no means disabled. The petition was not precipitated by calamity, loss of job or otherwise. Debtor has the ability to pay creditors a significant amount of the debt which is owed to them. That debt was incurred by accumulating a multiplicity of credit card debts under circumstances which are highly questionable and suggest complete disregard for an eventual ability to pay, or worse, a design to incur dischargeable debt while avoiding nondischargeable debt. I conclude that debtor's petition should be dismissed for substantial abuse under section 707(b).[5]

While, as Judge Kressel ably noted in *Wegner*, substantial abuse may be difficult

to define, I conclude, as Justice Stewart did with respect to hard-core pornography, as follows:

"I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it...."

*Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964).[6]

For the foregoing reasons,

IT IS HEREBY ORDERED that the motion of the United States Trustee to dismiss this case for substantial abuse under 11 U.S.C. section 707(b) is granted. This order shall not become effective if, within 20 days of the date of this order, debtor voluntarily converts his case to one under chapter 13, pursuant to 11 U.S.C. section 706(a).

---

**5.** There are a number of decisions in which courts have dismissed for substantial abuse based on quite similar facts. *See, e.g., In re Day,* 77 B.R. 225 (Bktcy.D.N.D.1987) (ability to pay 100% of unsecured debt, therefore case dismissed for substantial abuse); *In re Webb,* 75 B.R. 264 (Bktcy.W.D.Mo.1986) (purpose of debtor rehabilitation is disserved if bankruptcy courts must be used in order to afford debtors basis for making their creditors pay for their luxuries); *In re Kress,* 57 B.R. 874 (Bktcy.D.N.D.

1985) (debtor had ability to pay back his unsecured creditors 100% in just over three years); *In re Bryant,* 47 B.R. 21 (Bktcy.W.D.N.C.1984) (conscious disregard of bankruptcy provisions and bad faith efforts to avoid paying creditors amounted to substantial abuse).

**6.** I cannot help but note that this case illustrates Judge Kressel's newly coined axiom in *Wegner,* "pigs go on a diet, but hogs go free."